U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the order of the Court.**

**Signed February 24, 2006**

*Barbara J. Houser*

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ROMACORP, INC., *et al.,* | § | **CASE NO. 05-86818-BJH-11** |
| | § | |
| | § | **Jointly administered** |
| Debtors. | § | |

### MEMORANDUM OPINION AND ORDER GRANTING, IN PART, TEMPORARY
### ALLOWANCE OF CLAIM FOR VOTING PURPOSES

Before the Court is a Temporary Allowance Motion (defined hereinafter) under Bankruptcy

Rule 3018. The Court held a hearing on the Temporary Allowance Motion on February 21, 2006.

The Court has core jurisdiction over that motion and the parties in accordance with 28 U.S.C. §§

1334 and 157(b).

After carefully considering the evidence presented and the arguments of counsel, the Court

issues this Memorandum Opinion and Order which contains its findings of fact and conclusions of law

**Memorandum Opinion and Order**

in accordance with Bankruptcy Rule 7052.

## I.    Factual and Procedural Background

Robert M. Roth, individually, ("Roth"), IGT Services, Inc. ("IGT"), and RMR Advertising,

Inc. ("RMR") (Roth, IGT, and RMR will be collectively referred to herein as the "Roth Entities")

filed suit against Romacorp, Inc. ( "Romacorp" or the "Debtor") in Florida state court in 1994 (the

"State Court Suit"), alleging, *inter alia*, that Romacorp breached a letter agreement among the parties

(the "Agreement") pursuant to which, as relevant here, Romacorp agreed to purchase advertising

media exclusively from RMR and IGT so long as "RMR/IGT can provide Romacorp's requirements

with respect to such media on the same or better competitive basis as other media buying agencies."

Roth Exh. 16 at p. 2, ¶ 3.

The State Court Suit remained pending, without having been tried, at the time of Romacorp's

voluntary filing for protection under Chapter 11 of the United State Bankruptcy Code on November

6, 2005, thereby commencing this bankruptcy case (the "Case"). Accordingly, while the Roth Entities

had 11 years within which to liquidate their claims, those claims remained unliquidated and disputed

at the time the Case was commenced.

On or about January 6, 2006, the Roth Entites filed a proof of claim in the Case, asserting

damages flowing from the Debtor's alleged breach of the Agreement, in the amount of

$1,819,787.10, plus legal fees (the "Proof of Claim"). *See* Exh. D-A. On January 16, 2006, the

Debtor filed its objection to the Proof of Claim. Accordingly, and in accordance with Bankruptcy

Rule 3018, on January 27, 2006, the Roth Entities filed a motion for temporary allowance of the

Proof of Claim for purposes of voting on the Debtor's Amended Plan of Reorganization (the

"Temporary Allowance Motion"). The plan is set for a hearing on confirmation on March 7, 2006.

## II. The Parties' Contentions and Evidence

### A. Is there a Breach?

Not surprisingly, the Roth Entities and the Debtor interpret the Agreement differently. The key provision of the Agreement is paragraph 3, which is quoted above. The Roth Entities contend that while the Debtor was entitled to receive bids from other media buying agencies, once those bids were received, the Debtor agreed to give RMR/IGT the right to match or beat those other bids, such that RMR/IGT had an exclusive right to place Romacorp's advertising. Conversely, the Debtor contends that RMR/IGT had the right to bid on the advertising contemporaneously with any other agencies, and then the Debtor was obligated to place the advertising with RMR/IGT if they were the low bidder, or were tied for the low bid.

While the Agreement clearly provides that Romacorp "will purchase advertising media exclusively" from RMR/IGT, Roth Exh. 16 at p. 2, ¶ 3, the Agreement is silent on the procedure to be used to accomplish those exclusive media purchases. Because the Roth Entities and the Debtor both offered plausible explanations for how the exclusivity provision should be interpreted, the Court must find the Agreement ambiguous as to the procedure to implement the exclusivity provision. *See Friedman v. Va. Metal Prods. Corp.*, 56 So. 2d. 515, 517 (Fla. 1952) (noting that a contract phrase or term is ambiguous when it is susceptible to multiple interpretations). Accordingly, parol evidence is admissible to explain the parties' intentions in how the Agreement was to be implemented. *Id*.

The Roth Entities offered Roth's testimony in this regard. Roth testified that Romacorp was obligated to give RMR/IGT the right to match or beat the low offer after competitive bidding among other agencies had occurred – *i.e.*, that RMR/IGT was essentially entitled to a "last look." While Romacorp did not offer any witness testimony to support its interpretation of the exclusivity provision

of the Agreement, it did introduce evidence that it had asked RMR/IGT to bid on its advertising needs, along with other agencies, after the Agreement was signed, and that RMR/IGT declined to bid. *See, e.g.*, Exhs. D-I, D-J, D-K, & D-L.

Roth agrees that Romacorp asked RMR/IGT to bid on its advertising needs after the Agreement was signed and that RMR/IGT declined to bid. However, Roth explained that RMR/IGT refused to bid because of their view that they were not obligated to bid. Rather, according to Roth, RMR/IGT was supposed to get the last look at the bids and respond accordingly.

### B. What Damages Flow from a Breach?

Regarding damages, the Roth Entities offered the testimony of Roth and Gary Trugman ("Trugman"), a CPA and business valuation expert. *See* Exh. D-H.[1] Trugman testified that RMR suffered damages of $2,149,255.19 from Romacorp's failure to place its media buying through RMR. Trugman calculated this damage amount by multiplying a national standard 15% commission to what he believes were Romacorp's advertising purchases during the 5-year exclusive period called for by the Agreement, resulting in lost commissions of $1,108,192.57. Trugman then calculated the pre-judgment interest that RMR would be entitled to receive under Florida law on these lost commissions, resulting in interest of $1,041,062.62. When the lost commission amount is added to the pre-judgment interest amount, RMR's total damages of $2,149,255.19 are derived.

Roth testified that he thought Trugman's calculation of damages was very conservative. Roth also testified that RMR/IGT would have had no, or very minimal, incremental expense in handling the Romacorp advertising.

----

[1]Trugman's direct testimony was included in a Declaration that was prepared and filed by the Roth Entites in support of the Temporary Allowance Motion. Trugman was then made available for cross-examination.

The Debtor challenges the damages calculations on several bases. First, the Debtor contends that the Roth Entities are not entitled to recover for breach of contract because the Debtor did not breach the Agreement. Rather, the Roth Entities declined to bid on Romacorp's advertising needs and that failure excused further performance by Romacorp. Second, the Debtor points out that many of Trugman's assumed advertising purchases are really "bid requests," Exh. D-F, and that there is no evidence that those "bid requests" ever became placed advertising upon which a commission would be payable. Third, the Debtor contends that the Roth Entities should not be entitled to pre-judgment interest because of their lengthy delay in liquidating their claims. Fourth, the Debtor contends that the damages calculation offered by Trugman is suspect because of earlier inconsistent calculations – *i.e.*, one produced in the State Court Suit[2] and the amount stated on the Proof of Claim. Finally, the Debtor contends that the Roth Entities failed to present a legally permissible calculation of damages under Florida state law because they failed to account for overhead or other costs associated with producing these increased revenues. In short, the Debtor contends that even if the Roth Entities proved what *revenues* might have been generated from the Agreement, they failed to prove the amount of their *lost profits* flowing from the alleged breach of the Agreement.

## III.    Legal Analysis

Section 1126(a) of the Bankruptcy Code provides that only holders of allowed claims or interests may vote to accept or reject a plan. Section 502(a) of the Bankruptcy Code provides that a claim is deemed allowed unless a party in interest objects. A creditor whose claim is objected to

---

[2]Trugman was apparently hired to provide expert testimony in the Case very recently. However, in supplemental answers to interrogatories served in the State Court Suit on June 1, 2005, the Roth Entities provided a damages calculation, including interest, of $1,388,138.90 [sic] (damages of $673,670.66 and pre-judgment interest of $714,466.28). *See* Exh. D-E at p. 11/31. No explanation was offered for the differing, and significantly higher, calculation now offered here.

"is therefore disenfranchised from voting on the plan unless the objection is adjudicated prior to plan voting, or a mechanism, such as temporary allowance, is provided for." *In re Stone Hedge Props. v. Phoenix Capital Corp. (In re Stone Hedge Props.)*, 191 B.R. 59, 63 (Bankr. M.D. Pa. 1995). The mechanism for temporary allowance is provided by Bankruptcy Rule 3018. The policy behind temporary allowance is to prevent possible abuse by plan proponents who might ensure acceptance of a plan by filing last minute objections to the claims of dissenting creditors. *In re Armstrong*, 294 B.R. 344 (10th Cir. BAP 2003), *aff'd* 97 Fed. Appx. 285 (10th Cir. 2004). The ultimate determination of whether to temporarily allow a claim for voting purposes is within the Court's sound discretion. *Id.*; *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996).

For the reasons explained more fully below, the Court concludes that RMR shall be allowed, temporarily and solely for purposes of voting on the plan, a nominal claim in the amount of $10,000.00, while Roth and IGT shall not be permitted to vote on the plan. The Court comes to these conclusions because while the Roth Entites offered credible evidence to support their breach of contract claim against the Debtor, they failed to offer either credible evidence regarding the amount or proper measure of their damages.

Under Florida law, the correct measure of damages for a breach of contract claim is lost profits, not lost operating revenue. *Boca Developers, Inc. v. Fine Decorators, Inc.*, 862 So. 2d 803, 804-05 (Fla. Dist. Ct. App. 2003); *Indian River Colony Club, Inc. v. Schopke Constr. & Eng'g, Inc.*, 619 So. 2d 6, 7 (Fla. Dist. Ct. App. 1993); *Physicians Reference Lab., Inc. v. Daniel Seckinger, M.D. & Assocs., P.A.*, 501 So. 2d. 107, 108 (Fla. Dist. Ct. App. 1987). As the court stated in *Indian River Colony Club*, "[b]ecause IRCC breached the construction management contract, Schopke is entitled to recover the amount of profit it would have earned during the remainder of the term of the

contract had there been no breach." 619 So. 2d at 7.  Further, in calculating prospective lost profits, Florida courts require that the overhead of the non-breaching party be allocated across all of its operations.  *Boca Developers*, 862 So. 2d at 804-05 (refusing to allow gross revenues from breached contract as lost profits on the argument that all overhead had been compensated by earlier jobs; the court required the non-breaching party to allocate its overhead across all jobs it engaged in to calculate lost profits); *see also Pahokee Housing Auth., Inc. v. S. Fla. Sanitation Co.*, 478 So. 2d 1107, 1108 (Fla. Dist. Ct. App. 1985).

Applying this legal standard for damages here, the Court concludes that the Roth Entites failed in their proof by relying on gross revenues they assert would have been generated from the Agreement instead of lost profits.  The evidence regarding each entity – RMR, IGT, and Roth, will be separately addressed.

Turning first to RMR, the Court notes that RMR offered no evidence of either its historic or current profit margin on its operating revenues.  Rather, implicit in the limited evidence offered on the damages issue, is RMR's contention that all of the revenue it lost from the Debtor's alleged breach of the Agreement would be profit.  In this regard, the only evidence offered is Roth's terse statement that he believed RMR could have handled Romacorp's advertising business without any incremental operating expenses, or a very minimal increase in its operating expenses.  Trugman testified that he relied on Roth's statement (and a similar statement made to him by another RMR employee) in making his damages calculation – *i.e.*, in using gross revenues to be generated from the Agreement plus pre-judgment interest on those revenues, as the basis for his damages calculation.

However, Roth's terse testimony, standing alone, is simply not credible.  It is hard to believe that over a million dollars in revenue can be generated without incurring any incremental operating

expenses over a 5-year period. And, significantly, the Roth Entities offered no evidence to corroborate this surprising contention. No tax returns, financial statements, or any other financial documents were offered. In short, the Court has no idea of RMR's profitability in general, nor how it could have reasonably expected the Romacorp revenues to drop to the bottom line as profit. Nor was there any evidence offered regarding the profitability of advertising agencies generally – *i.e.*, that there is some point in achieving operating revenues, that management of an advertising agency can reasonably expect that all incremental revenues are pure profit.

In short, on the record before it, the Court has no reasonable basis upon which to conclude what amount of the gross revenues that RMR might have received under the Agreement would have been profit to RMR. Accordingly, the Court has no basis upon which to calculate the amount of profits RMR lost by the Debtor's alleged breach of the Agreement. Since the Court is unable to estimate the amount of RMR's lost profits from the Debtor's alleged breach of the Agreement on the evidentiary record before it, the Court cannot estimate the amount of pre-judgment interest that RMR would otherwise be entitled to receive on account of those lost profits.

Because there is even less evidence[3] of Roth's damages, if any, and no evidence of IGT's damages, if any, flowing from the Debtor's alleged breach of the Agreement, Roth and IGT will not be permitted to vote on the plan at all. However, because RMR offered credible evidence supporting its breach of contract claim against the Debtor (as opposed to offering evidence of a proper measure of damages flowing from that breach), the Court believes that it is appropriate to allow RMR to vote

---

[3]Trugman's declaration focused solely on RMR's damages. *See* Exh. D-H. Upon realizing their oversight, Roth and Trugman both attempted to explain that RMR and IGT are subchapter S corporations, such that the damages flowed to Roth. However, such evidence failed to (i) identify specific damages to IGT, and/or (ii) identify damages actually suffered by Roth.

on the plan. Accordingly, the Court will temporarily allow RMR a claim in the amount of $10,000.00 for purposes of voting on the plan.

At the conclusion of the hearing on the Temporary Allowance Motion, the Court extended the time within which the Roth Entites must return ballots voting on the plan pending the issuance of this Memorandum Opinion and Order. Based on the ruling contained herein, RMR shall have until 5:00 p.m. on March 1, 2006 to return its ballot to the Debtor in accordance with the balloting procedures previously approved by the Court.

**SO ORDERED**.

### End of Order ###